Filed 10/20/20  P. v. Solano CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B288587 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA125790 |
| v. | |
| JULIO SOLANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Judgment of conviction affirmed; matter remanded for further proceedings.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Julio Solano of the first degree murder of his wife Farrah Lindsay Solano and he pleaded no contest to possession of a firearm by a felon. Solano appeals and we affirm his conviction and remand for further proceedings.

## BACKGROUND

On July 15, 2013, an information charged Solano with murdering Lindsay[1] on July 15, 2012 (Pen. Code,[2] § 187, subd. (a)), and alleged he personally discharged a firearm resulting in her death (§ 12022.53, subds. (b), (c), (d)). Count 2 charged Solano with possession of a firearm by a felon (§ 29800, subd. (a)(1)). The information alleged Solano had a prior conviction for robbery, which was both a prior serious or violent felony (§ 667, subd. (a)(1)) and a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Solano pleaded no contest to count 2 and went to trial on the murder charge in February 2018.

### 1. *Prosecution evidence*

#### a. *William Ortiz*

Ortiz was Lindsay's mother's first cousin, and he had known Lindsay all of her life and Solano since he was 14. On July 15, 2012, Lindsay and Solano were separated and had been fighting on the telephone. She called Ortiz and asked him to go with her to pick up her kids in Huntington Park, where Solano was staying with his family. She drove her Honda Pilot to Ortiz's house and picked him up around 3:00 or 4:00 p.m., with her

---

[1]     For clarity, we use her middle name Lindsay (most often used by witnesses) and we use the first names of other members of the Solano family.

[2]     All subsequent statutory references are to the Penal Code.

2

18-year-old daughter Lizette in the back seat. When they arrived at the Solano house 10 or 15 minutes later, Lindsay parked in the street, facing and blocking the driveway, in which a car was parked. Lindsay went into the house, and Ortiz waited in the driveway.

Lindsay came back out of the house, with Solano walking behind her. They both seemed upset. As she passed Ortiz, she said, " 'The fool's got a gun.' " Ortiz walked to where Solano stood on the porch steps. Lindsay yelled at Solano from the sidewalk. Solano yelled back: " 'You abandoned this family. You are no longer a part of this family,' " and " 'Get the fuck out of here.' " Solano looked under control, and Ortiz told him to keep it cool. Solano nodded and said, " 'Yeah. We'll talk later.' "

Ortiz walked back toward Lindsay and Lizette, who stood on the sidewalk in front of the Pilot, and said: " 'Let's go.' " Lindsay said, "I want to kiss my kids,"[3] and headed back to the house. Her hands were completely empty. Solano was still on the porch. Lizette got into the driver's side back seat of the Pilot, and Ortiz leaned in the passenger side back window talking to Lizette. He heard three pops, and saw Lizette turn "ghostly white." He asked: " 'Did something terrible just happen?' " Lizette nodded yes.

Lizette and Ortiz ran back toward the house. Lindsay was staggering, and dark red blood ran down her arm. Ortiz put an arm around Lindsay to steady her and walked her to the passenger side of the Pilot. He heard a commotion and headed toward the house to take Lizette away from the situation.

---

[3]     At the preliminary hearing, Ortiz testified Lindsay said: " 'I'm going to get my kids.' "

Lizette was trying to enter the house, but family members held her back.  Ortiz grabbed Lizette and said, " 'Let's get out of here.' "  They went back to the Pilot.  He looked around for Lindsay, who wasn't where he had left her by the car.  Solano walked down the driveway and barked at Ortiz to open the gate.  Ortiz nodded at Lizette to move the Pilot.  She moved the car, and Solano drove away.

A neighbor pointed Ortiz to a box van parked across the street.  He rushed over and found Lindsay lying there.  Her brown eyes turned pale gray, and she died.

On cross-examination, Ortiz said Lindsay asked him to go with her so Solano "wouldn't do something crazy" in what he understood was a heated situation.  He did not see Solano with a gun, or in a shooting stance.

b.      *Aracely Solano Araujo*

Solano's sister Aracely testified she lived in Huntington Park with her husband and two children.  Her sister Catalina lived in a detached back house.  Solano moved into Aracely's house in February 2012.  His and Lindsay's two younger children, 12-year-old Julio and five-year-old Rene, lived with him every other week.

On July 15, 2012, Aracely was cooking rice when she heard footsteps.  She turned around to see Lindsay and Solano passing through the kitchen as if to go to the back house.  Aracely was surprised Lindsay did not hug or kiss her as she always did.  She asked what happened, and Lindsay said, " 'Nothing.' "  After a few minutes, Solano walked quickly back through the kitchen with Lindsay behind him.

A short while later, Aracely went out to the front porch to see what was going on.  Ortiz and Lizette were inside the Pilot,

4

Lindsay was in the driveway, and Solano was on the porch. Solano said: " 'I'm not gonna give you the kids,' " and Lindsay shouted things like: " 'Watch. You'll see. You'll see what's gonna happen. Watch, mother fucker.' " Solano shouted: " 'Get out of here. Nobody wants you here anymore. This is not your family anymore. This is private property.' "

Aracely went back inside to check the rice, and heard pops that were not like fireworks. She went to the front door and saw Lindsay stumbling and trying to hold onto the side of the car. She ran back inside to tell her sister to take her mother to the back house. When she went out again, she saw Lindsay on the ground by the trash cans behind the car.

Aracely called 911 from inside the house. Solano knocked on the door of the second living room, asking five-year-old Rene to open it. After Aracely testified Solano was not holding a gun, the prosecutor played a recording of Aracely telling the police she saw Solano holding a gun. Rene opened the door. Solano went into his room, went back outside, and got into his car.

On cross-examination, Aracely said she loved Lindsay and Solano did not shoot her. The police had told her what to say, and she felt pressured. At the preliminary hearing, she testified she did not see Solano with a gun. Lindsay, however, "always carries guns," and once shot one of Aracely's younger sisters.

c.    *Lizette Solano*

Lizette was 18 in 2012 and lived with her mother in Rancho Cucamonga. Her little brother and sister split their time between Lindsay and Solano, who was living with her aunt Aracely. It was still light on July 15 when she, Lindsay, and Ortiz arrived at Solano's house and parked halfway into the driveway. Solano was smoking a cigarette on the porch,

5

looking upset.  Lindsay got out of the car and went up to Solano.
They had what looked like a serious conversation.  Lindsay
returned to the Pilot looking worried.  She said Solano was
keeping the kids until Wednesday and they were about to leave,
but she wanted to say goodbye to the kids.  Lizette asked if it was
okay to say goodbye to her father.  She went up to Solano on
the porch and tried to say goodbye, but he was very upset and
said nothing.  She went back to the car.

Lindsay was halfway back to the Pilot from the house
as Lizette got into the car.  She heard a pop she thought was
a gunshot.  She turned around and saw Solano on the porch in
a shooting stance and pointing a gun at Lindsay, who was facing
him.  He shot Lindsay two more times, as Lindsay twirled in
a circle to move away, yelling at him to stop, and then stumbled
away.  Lizette did not hear Lindsay make any threats.  Solano
fled into the house and Lizette ran after him, but one of Lizette's
aunts pushed her back.  She searched for her mother and found
Lindsay across the street lying on her stomach, bleeding
everywhere.

Lizette was screaming, and Ortiz came over.  Solano had
jumped into his car, but the Pilot blocked the driveway, and
Lizette moved it so he could get out.  "[H]e had a gun in his
hands, so I was scared for my safety so I just let him leave."
Solano drove away.

Lizette testified Lindsay never got back into the Pilot or
reached in to remove anything, and she never handed anything
to her mother.  She had never seen Lindsay with any type of
weapon.

A year later, on July 14, 2013, Solano called Lizette from
jail.  He told Lizette, "[I]t's not a joke in here, baby" and "these

6

people are not playing around." Solano said, "[E]verything I wanted was for our family to be together, Lizette," and she responded: "You don't get that. I lost both of my parents." He insisted, "[T]his is not what I had planned. . . . I wanted to be happy with my wife, with my kids again." Lizette reminded him it had been a year since her mother was gone, and he replied, "[T]omorrow is going to be the day for me too." (The information was filed the next day.)

Solano asked Lizette to talk to her aunts, and she answered that when she did "all I get is questioned." Her little brother and sister didn't want to go over there either, and the kids were hers now. Solano said, "I loved you with all my heart," but "[t]hings in here are—are—are different and difficult for me," and she needed to talk to her aunts. Then he said: "You could change a lot. You could just—you—you have the opportunity to bring me home, baby. This DA wants to give me life, Lizette." She answered: "I'm gonna tell the truth, and what I saw is what I saw. . . . I'm sorry to say it like this too, but it's a life for a life. You took my mom's life." He responded: "I didn't take her life, Lizette. That's where you got it wrong. I didn't take her life. God took her life."

Solano told Lizette he loved her and was proud of her, but "accidents happen Lizette, and this [is] not what I planned it. This is not what I wanted. This is—you know that I wanted my wife back. . . . I wanted to build my family back . . . . You know your mom was out of control. You—I know what you guys were doing in the house. I know you guys were partyin' in the house and everything." Lizette responded: "Excuse me. We weren't even partying at the house . . . so why do you even say that? . . . [Y]ou're [*sic*] fuckin' family thinks that shit too." Solano explained he meant she had her friends over when Lindsay

7

wasn't there, and if a minor got hurt, "who do you think would've got blamed for that?"

Solano told Lizette he loved her, and repeated: "That's not what I intended. . . . I didn't take your mom's life, baby. He [God] did. . . . God told me to call you today and just ask you to forgive me." She told him she loved him and missed him. He responded: "[L]ike you say, you're not gonna lie. Sometimes— you know, we have to do—" and Lizette interjected: "I'm not." Solano continued: ". . . what we have to do. I know you don't want to. I know you don't want to, baby. And I know it's wrong, but, baby, my life depends on it, love." Only God could judge him, and, "All I wanted was her in my life. I just wanted my family. I don't got nobody no more." Lizette answered: "And you think I do?"

Solano told Lizette he wanted to come back home and live with her and her little brother and sister, and he promised not to remarry. "I trust you with my life. And I trust you that you're gonna do the right thing . . . . So please momma, I'm begging you. If you can't do it for me, do it for [Rene]. Do it for your brother." Lizette replied she trusted no one, not even her own family: "I'm seriously on my own." Solano said, "They want to kill me in here, baby." He urged her: "You do that right choice, momma. You do that right thing now, because God's gonna bless you." Solano repeated he loved her and was proud of her, and ended the call with, "[D]o the right choice, momma. Do the right choice. You hear me?"

On cross-examination, defense counsel grilled Lizette about insurance money she received after Lindsay's death and what she told the Department of Children and Family Services (DCFS) two months later. Lizette testified Solano, Aracely, and Catalina

all were on the porch when Solano shot Lindsay.  Solano had been upset that a male friend of Lizette's was staying at the house in Rancho Cucamonga.  On redirect, she explained she did not go into detail when she talked to DCFS, because the criminal case was ongoing.

d. *Forensics and sheriff's investigation*

The medical examiner testified multiple gunshot wounds caused Lindsay's death.  The fatal wound was from a bullet that entered the right side of her back and passed through her left lung and a portion of her heart.  The other wounds were caused by bullets that entered the side of her right arm and the upper bicep area of her left arm, and there was an exit wound on her right forearm by her wrist.

Deputy Sheriff Audrey Detreville responded to the scene and found Lindsay lying on the curb next to a moving truck, unresponsive and without a pulse.  The three or four people standing around were hysterical.  Ortiz told Deputy Detreville Lindsay said she wanted to kiss her kids before returning to the house.  Aracely did not tell the deputy Lindsay threatened Solano by yelling, " 'You'll see what's gonna happen.  Watch, mother fucker.' "  A detective who arrived at the scene after midnight marked what appeared to be blood on the third step of the porch stairs, the driveway, the sidewalk, the street, and the bumper of a van.  No shell casings were found.

Deputy Carlos Delatore testified he searched the Pilot at the scene.  He found an unloaded .32-caliber Beretta in the glove compartment in a nylon holster and a small magazine in the left rear compartment.  About seven hours after Solano fled and five hours after the deputies contained the crime scene, two cars pulled up and Solano and a group of people got out.  Solano said:

9

" 'I'm the guy you're looking for. I don't have any weapons on me. You can search me,' " and asked to see his children before he was arrested. Tests found no gunshot residue on Solano or Lindsay.

Detective John Duncan and his partner interviewed Aracely early the next morning at the sheriff's station. She told them she heard three shots and saw Solano following Lindsay. Solano was holding a gun after the shooting, when he asked Rene to open the door. Detective Duncan also interviewed Lizette, who said she heard gunshots, turned around, and saw Solano holding a gun. He shot Lindsay in the back.

## 2. *Defense evidence*

Solano's sister Catalina testified that when she was young, she and Lindsay were arguing and Lindsay shot her with a gun Lindsay had in a diaper bag. Catalina went to the hospital and Solano visited her. On the day of the shooting Catalina— not Ortiz—was the one who found Lindsay. He was seven houses away.

## 3. *Closing arguments*

The prosecutor argued strong evidence proved Solano murdered Lindsay, including witness interviews and testimony, evidence of motive, and Solano's flight. The defense had presented no evidence of a conspiracy to take the children by force. The jail phone call from Solano, in which he asked Lizette to lie, removed any possible doubt that he fired the shots. No evidence showed self-defense; the unloaded gun in Lizette's car never left the glove compartment. Solano shot Lindsay in the back. He was angry with someone he once loved, and the shooting was an intentional act done with malice. Nor did the evidence show provocation adequate for voluntary manslaughter, so the jury had to decide "[i]s it a second degree murder or do

you go up to first degree murder?" Solano had enough time to premeditate and make the decision to shoot Lindsay, and then to shoot twice again. This was a calculated first degree murder.

Defense counsel argued "the government lied to you in your face." Lindsay drove to Solano's house to kidnap her children when it was Solano's custodial time. She had a gun, and brought Ortiz (her "boyfriend") with her to "break up the fight," but he was never searched for a gun or tested for gunshot residue. The magazine found in the car was missing bullets. Ortiz testified he did not see the shooting, which meant "at the time of the shots my client wasn't there." Lizette changed her story about seeing Solano shoot Lindsay after she got the insurance money. No gun was found. Solano turned himself in, and no gun residue was detected on him or his clothes. "There is no evidence my client shot anybody. . . . But there is evidence that the government has been taking people and having them change their testimony." It was not the defense's job to say who shot Lindsay, but Lizette and Ortiz were behind Lindsay as she walked to the porch from the car, they were the only people "that knew they were going to a fight and needed a weapon," a gun and a partially loaded magazine were in the car, and "it's a level shot" for both Lizette and Ortiz.

Defense counsel argued first degree murder was "silly." Repeating that the prosecutor did not prove beyond a reasonable doubt that Solano shot Lindsay, he argued "[a]nyone would be provoked" if someone came to "steal my kids," and the instructions on provocation applied. And as for justifiable homicide, "[y]ou can, by the law, stop someone from coming to your house and taking your kids," which was kidnapping. "You must find the defendant not guilty of murder." Even if the

11

jury believed the prosecution had proved Solano shot Lindsay, a defendant was entitled to stand his ground and defend himself until the danger of kidnap had passed.

Counsel concluded "there is a reasonable doubt as to who the shooter was because we don't know who the shooter was," and asked the jury to find Solano not guilty.

In rebuttal, the prosecution argued defense counsel was trying to distract the jury from the evidence by arguing that Lizette or Ortiz might have killed Lindsay. "[E]very single shred of circumstantial and direct evidence points one direction," toward Solano. He armed himself before he went out to the porch, and did not act in self-defense or under adequate provocation. When he called Lizette from jail, Solano did not tell Lizette he had been angry with Lindsay or defended himself from her; instead, he asked Lizette to lie.

**4.      *Verdict and sentencing***

The jury found Solano guilty of first degree murder and found the firearm allegation true. Solano admitted the prior serious felony allegations. The court sentenced him to two years for his no contest plea to the possession of a firearm by a felon, doubled for the prior strike. The court imposed a concurrent term of 25 years to life for the murder, doubled under sections 667, subdivisions (b)-(i) and 1170.12, subdivisions (a)-(d), an additional 25 years to life under section 12022.53, subdivision (d), and a five-year enhancement under section 667, subdivision (a). The total term was five years plus 75 years to life. The court also imposed fines and fees, which we discuss below.

12

## DISCUSSION

1. ***The trial court properly instructed the jury on provocation***

Solano argues the instructions did not inform the jury about provocation sufficient to reduce first degree murder to second degree, and this prejudiced him. CALCRIM No. 520 told the jury if they decided that Solano committed murder, "it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM 521." CALCRIM No. 521 instructed the jury that Solano was guilty of first degree murder if the prosecution proved he acted "willfully, deliberately, and with premeditation," and "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Without objection from Solano's counsel, the trial court instructed the jury on the effect of provocation on a murder charge using CALCRIM No. 522: "Provocation may reduce a murder from first to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Solano argues the court was required to give the jury an additional instruction, explaining that provocation sufficient to reduce the crime to second degree murder is judged by a subjective standard. He claims such an instruction was necessary to distinguish the provocation sufficient to reduce murder to heat-of-passion manslaughter, which must meet an

13

objective standard (as the jury was instructed with CALCRIM No. 570, "provocation [that] would have caused *a person of average disposition* to act rashly and without due deliberation, that is, from passion rather than from judgment" (italics added)).

The People respond that, because Solano failed to object or request a modification or an additional instruction, he has forfeited this argument. In *People v. Mayfield* (1997) 14 Cal.4th 668, 778, the trial court gave an instruction on how provocation should be considered in evaluating whether the defendant deliberated and premeditated. The defendant argued the instruction was ambiguous and failed to tell the jury what subjective factors to consider in deciding how provocation related to the elements of first and second degree murder. Our Supreme Court pointed out, first, that the instruction was a pinpoint instruction the trial court did not have to give sua sponte, and, second, that the court was under no obligation to amplify or clarify the instruction in the absence of a request. (*Id.* at pp. 778-779.) Nevertheless, if the court gave misleading instructions to the jury, the error would affect Solano's substantial rights, so we address the issue. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333, fn. 3.)

In *People v. Jones* (2014) 223 Cal.App.4th 995, Division 4 of this district faced the same contention. As here, the jury had been instructed with CALCRIM Nos. 520 (First or Second Degree Murder with Malice Aforethought), 521 (First Degree Murder), 522 (Provocation: Effect on Murder), and 570 (Voluntary Manslaughter: Heat-of-Passion Lesser Included Offense). (*Jones*, at p. 999.) Like Solano, the appellant argued "that jury instructions on the doctrine of provocation were misleading because they did not, or did not explicitly, inform the jury that

14

the objective standard applies only for reduction of murder to voluntary manslaughter, and does not apply to reduce first to second degree murder." (*Ibid*.) The instructions were correct, because "[t]hey accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' ([*People v.*] *Hernandez, supra*, 183 Cal.App.4th at p. 1334.) As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*Id*. at p. 1001.) Similarly, here, the instructions were not incorrect or misleading. "What appellant is arguing is that a more specific instruction, actually a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder. [Citation.] Defense counsel did not request such an instruction, and his failure to do so forfeits the claim on appeal." (*Ibid*.)

Solano attempts another tack, arguing that provocation for second degree murder has "a technical meaning peculiar to the law," requiring the court to give an instruction. But "[i]n this context [CALCRIM Nos. 521 and 522], provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term." (*People v. Hernandez, supra*,183 Cal.App.4th at p. 1334.) Although the jury

15

in *People v. Hernandez* had not been instructed on voluntary manslaughter, "a word or phrase has a technical, legal meaning that requires clarification only if it 'has a definition that *differs* from its nonlegal meaning.'" (*People v. Elam* (2001) 91 Cal.App.4th 298, 306.) Here, the common nonlegal and legal meanings of "provocation" are not different. We agree with *People v. Jones*, that when CALCRIM No. 570 is given, the pattern instructions are not misleading.

Because the instructions were correct and not misleading, they did not violate federal or state law. For the same reason, we reject Solano's argument that his trial counsel was ineffective when he failed to request a pinpoint instruction on provocation.

**2.** ***The prosecutor did not commit misconduct***

In closing argument, the prosecutor discussed CALCRIM No. 570, telling the jury voluntary manslaughter was a killing that occurs in a heat of passion, requiring a provocative act by the victim that caused the defendant to "act[ ] out of intense emotion and not out of reason, and that there was an insufficient time to cool off." Such a defendant did not engage in calculated decisionmaking. The prosecutor continued: "I want to know, what is the provocative act that occurred here? [¶] I would imagine that throughout the world these custodial issues are happening time and time again. Is that it? Is that all that it takes? That it was his day, not hers, and that this caused him to be so provoked that it obscured his judgment? You decide. You, the jury, decide to set the standard. It is a reasonable person standard. He does not get to set his own standard for provocation. [¶] Even if he really was provoked, *would a reasonable person have reacted this way out of an inability to reason?* It's preposterous. It is not enough to justify this cold-

16

blooded killing. [¶] And, again, I am struggling to understand which particular act is provocative." (Italics added.) The prosecutor argued Solano armed himself well before shooting Lindsay repeatedly, and there was no heat of passion.

During his rebuttal argument, the prosecutor said Lindsay wanted the kids a day early and Solano was angry. "But so provoked by this, the nerve of this woman, to say that a reasonable person couldn't act out of their own rational free will, couldn't take a breath and go, all right, I know you're upset, but you're not getting the kids back. Couldn't do that? Just saw red, had to pull out a gun and shoot her four times. It's not reasonable. It could be in different scenarios, but it isn't here." At no point did Solano's counsel object.

Solano argues that when the prosecutor used the language italicized above, he misstated the law of voluntary manslaughter and committed misconduct. But he forfeited this appellate argument by failing to object and request an admonition to cure any harm, because "[n]othing suggests an objection would have been futile or an admonition inadequate to cure any harm." (*People v. Adams* (2014) 60 Cal.4th 541, 569.) This is not a close case with grave doubt about Solano's guilt, nor is it likely that the prosecutor's remarks materially contributed to the jury's finding that he was guilty of first degree murder. (*People v. Ferguson* (1982) 129 Cal.App.3d 1014, 1022.)

We address the merits only as necessary to decide Solano's claim that his counsel's failure to object was ineffective assistance. (*People v. Ochoa* (1998) 19 Cal.4th 353, 431.) Solano has a state and federal constitutional right to the effective assistance of counsel. To show that he did not receive that assistance, he must establish by a preponderance of the evidence

17

that his counsel's representation was objectively unreasonable, and that it is reasonably probable that the outcome of his trial would have been different but for counsel's error. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Solano contends that by asking the jury "would a reasonable person have acted this way out of an inability to reason?", the prosecutor told the jury to focus not on whether the provocation was sufficient to cause a reasonable person to act rashly, but whether a reasonable person would do what Solano did—react "this way" by shooting Lindsay. To determine whether the defendant's reason was obscured by provocation sufficient to negate malice, "[t]he focus is on the provocation— the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation . . . is not relevant to . . . heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

The prosecutor's argument on heat-of-passion voluntary manslaughter focused on the elements described in CALCRIM No. 570, and correctly emphasized that the evidence did not show a provocative act by Lindsay adequate to cause a reasonable person to act out of intense emotion and not reason: "It is a reasonable person standard. He does not get to set his own standard for provocation." The single passing reference to "the way" Solano reacted appeared in a phrase that properly asked the jury to consider whether, even if Solano actually was provoked, it would be objectively reasonable for Solano to have lost his ability to reason.

And the jurors were properly instructed with CALCRIM No. 570 that they should "consider whether a person of average disposition, in the same situation and knowing the same facts,

18

would have reacted from passion rather than from judgment" to decide whether provocation was sufficient for heat-of-passion voluntary manslaughter. The court also instructed the jury that if the attorneys' comments conflicted with the instructions, it should follow the court's instructions. We presume the jury understood the instructions and followed them as given. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

It is not reasonably probable that absent the prosecutor's remark, the jury would not have found Solano guilty of first degree murder.

### 3. *The court was not required to give CALCRIM No. 506*

Defense counsel argued Lindsay, Ortiz, and Lizette were "clearly armed," and arrived "knowing . . . there was gonna be a fight." They arrived at the Solano house "with the intentions of aiding and abetting Mrs. Solano in committing the crime of kidnap and/or battery and/or assault, went onto the property that my client lawfully resided at," and the " 'stand your ground' " rules applied. Counsel requested CALCRIM No. 506 (Defending Against Harm to Person Within Home or on Property). The prosecutor agreed the court should give CALCRIM No. 505 (Justifiable Homicide: Self-Defense) because defense counsel argued self-defense, but objected to giving CALCRIM No. 506. The court declined to give the instruction, finding insufficient evidence "to establish that there was any intention to enter the house for the purpose of committing an atrocious crime or a kidnapping."

CALCRIM No. 506 tells the jury the defendant is not guilty of murder or voluntary manslaughter if he killed to defend himself in his home. Such a killing is justified if "1. the defendant reasonably believed that [he] was defending a home

19

against [the victim], who . . . intended to or tried to commit [a] forcible and atrocious crime . . . ; 2. The defendant reasonably believed that the danger was imminent; 3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; AND 4. The defendant used no more force than was reasonably necessary to defend against the danger." (CALCRIM No. 506.) The instruction explains "[b]elief in future harm is not sufficient, no matter how great or how likely the harm is believed to be." (*Ibid*.)

A trial court must instruct on general principles of law relevant to the issues raised by the evidence, including defenses. (*People v. Lopez* (1992) 11 Cal.App.4th 1115, 1120.) An instruction is required whenever the evidence is substantial enough to merit consideration by the jury. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

To demonstrate he was entitled to the instruction, Solano must point to substantial evidence in the record showing he reasonably believed he was defending himself in his and his sister's home against Lindsay, who intended to commit an atrocious crime; the danger was imminent; and he reasonably believed the use of deadly force was necessary.

First, we agree with the trial court that Lindsay's coming to the house to pick up her two young children before the day agreed on in the couple's informal custody arrangement was not an intentional attempt to commit an atrocious crime. And in any event, to instruct with CALCRIM No. 506, there must be evidence the defendant acted in self-defense or defense of others, meaning "he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360.) No evidence showed

20

Solano could reasonably believe Lindsay intended to kill or inflict serious injury on someone in the house as she walked away. Second, the evidence was that Lindsay walked back toward the house to say goodbye to her children after telling Ortiz "[t]he fool's got a gun"; her hands were empty; she did not get into the Pilot or reach inside the car; and Lizette did not hand her anything. The evidence also showed Solano continued to shoot Lindsay after she turned around, following her as she walked down the driveway away from the house, and delivering the fatal shot to Lindsay's back. No substantial evidence supports a conclusion Solano could *reasonably* believe the danger that Lindsay would enter the house to commit an atrocious crime was imminent. Lindsay was walking away when he shot her. "[D]efense of habitation applies only if the defendant's belief that a trespass is occurring or about to occur is reasonable." (*Id*. at p. 1361.) Finally, no substantial evidence supports a conclusion that Solano could reasonably believe deadly force was necessary to protect his home against an unarmed woman whom he shot twice as she walked away toward her car.

The trial court did not err in declining to instruct the jury with CALCRIM No. 506. In any event, any error would have been harmless. The court did instruct the jury on the elements of kidnapping in CALCRIM No. 1215, and CALCRIM No. 505 told the jury a killing was justified if the defendant reasonably believed that someone else "was in imminent danger of being kidnapped," and reasonably believed the immediate use of deadly force was necessary to defend against that imminent danger.

4.      *Counsel's argument was not ineffective assistance*

Solano claims his private counsel's performance in closing argument "fell below the standard of reasonable competence

21

expected of criminal defense attorneys" and showed an "inaccurate assessment of the evidence and the law." Despite strong evidence Solano shot Lindsay, counsel argued there remained a reasonable doubt that he was the shooter. Solano also complains the evidence did not support self-defense, and yet counsel argued this as an alternate theory. Solano maintains his counsel should have argued he was guilty of provocation-based voluntary manslaughter or second degree murder, and if counsel had made these arguments, it is reasonably probable the jury would have found Solano guilty of manslaughter or second degree murder instead of premeditated first degree murder.

To prevail on a claim of ineffective assistance under either the federal or state Constitutions, Solano "must show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability." (*People v. Mayfield* (1993) 5 Cal.4th 142, 175.) We must consider whether the record contains any explanation for counsel's choices, and we do not second-guess tactical or strategic decisions. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058-1059.)

"Reversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." (*People v. Moore* (1988) 201 Cal.App.3d 51, 57.) "[H]aving chosen to make a closing argument, counsel cannot argue against his client. [Citations.] More particularly, unless his client consents, counsel cannot expressly or impliedly argue to the jury that his client is guilty." (*People v. Diggs* (1986) 177 Cal.App.3d 958, 970.) Concessions of guilt, however, do not necessarily establish that counsel is ineffective, and may be part of counsel's strategy.

22

(See *People v. Mayfield, supra*, 5 Cal.4th at p. 177; *People v. Mitcham, supra*, 1 Cal.4th at p. 1060; *People v. McDermott* (2002) 28 Cal.4th 946, 996-997.)

Solano, however, argues his counsel was ineffective because he *did not* concede that Solano shot Lindsay. The prosecutor argued the evidence was strong that Solano shot Lindsay with premeditation. In response, the defense told a different story: Lindsay drove to Solano's house to take the children, bringing Ortiz along as a bodyguard and carrying a gun in her glove compartment. This created a reasonable doubt as to who shot Lindsay during the confrontation over the children. Counsel maintained this strategy throughout the trial, and "a reasonable juror would have understood that the defense theory was simply that the prosecution had failed to prove defendant's involvement in the murder beyond a reasonable doubt." (*People v. McDermott, supra*, 28 Cal.4th at p. 997.) We will not second-guess counsel's strategy of challenging the credibility of Ortiz's and Lizette's testimony, insisting there was a reasonable doubt Solano shot Lindsay, and seeking acquittal on that basis. "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Solano's counsel also argued that first degree murder was "silly," and if the jury did find Solano shot Lindsay, it was only under provocation or in self-defense. The record on appeal does not " 'affirmatively disclose the lack of a rational tactical purpose' " (*People v. Williams* (1997) 16 Cal.4th 153, 215) for counsel's choice to argue the evidence left a reasonable doubt

23

whether Solano fired the shots, and then to argue that even if the jury disagreed, the evidence did not show a premeditated killing. To concede Solano fired the shots that killed Lindsay would be to abandon the theory the defense advanced throughout the trial.

We also see no reasonable probability the result would have been different if counsel had not argued there was a reasonable doubt that Solano shot Lindsay, and instead argued Solano was guilty of second degree murder or voluntary manslaughter. The evidence that Solano armed himself, went out to the porch, exchanged words with Lindsay as she walked to her car, and then shot her multiple times, including in the back, strongly supported the jury's finding that he premeditated and deliberated.

Solano points us to *In re Jones* (1996) 13 Cal.4th 552. In that habeas case, defense counsel did a completely inadequate pretrial investigation for a complicated capital trial, failed to interview a witness who would have testified she was told someone else killed the victim, elicited damaging testimony from a young girl that her mother told her the defendant killed the victim, and failed to object to the introduction of damaging evidence regarding the defendant's armed confrontation with a cocaine dealer and a shooting incident involving the defendant and his mother-in-law. (*Id*. at pp. 583-584.) At an evidentiary hearing, defense counsel explained his reason for not seeking to exclude the evidence of the mother-in-law shooting ("[T]he more things that come in the better."), which "clearly was unreasonable, and suggested that defense counsel's 'tactical' decisionmaking was grossly flawed . . . . When trial tactics are motivated by such a fundamental misunderstanding of defense counsel's proper role at trial, the likelihood that a defendant received constitutionally deficient representation obviously

24

is dramatically increased." (*Id.* at p. 586.)  Given counsel's many noted shortcomings on critical issues and the weaknesses in the prosecution's case, the court concluded the cumulative effect was prejudicial and reversed defendant's conviction.  (*Id.* at pp. 587-588.)

Here, the list of counsel's alleged deficiencies is nowhere near as long or as critical to the outcome of the trial, and the prosecution's case was strong.  On this direct appeal, counsel has had no opportunity to explain his motivation for his tactical choices, and we do not second-guess them.

Solano also cites *Duncan v. Ornoski* (9th Cir. 2008) 528 F.3d 1222.  Defense counsel in a capital murder trial failed to investigate and present evidence that the blood samples from the crime scene that did not belong to the victim also did not belong to the defendant.  (*Id.* at p. 1225.)  That was deficient performance, but because other evidence showed defendant participated in the robbery, he was not prejudiced with respect to his conviction for felony murder.  (*Ibid.*)  But the blood evidence could have shown that defendant was not the actual murderer, and so defendant was prejudiced with respect to the special circumstance, which required a finding the defendant intended that the victim be killed.  (*Id.* at pp. 1240-1241.)  If counsel had investigated the blood evidence, tested the defendant's blood, and presented the accomplice theory to the jury, it was reasonably likely that at least one juror would have had a reasonable doubt that the defendant was the one who killed the victim and intended for her to die.  (*Id.* at p. 1244.)  Counsel did not explain why he failed to consult a serology expert or investigate the potentially exculpatory blood evidence, and his explanations for not testing the defendant's blood were unpersuasive and showed

25

he was ignorant about forensic evidence.  (*Id.* at pp. 1237-1238.)
None of the reasons given in counsel's declarations was
consistent with a sound strategy entitled to deference.  (*Id.*
at p. 1239.)

Here, counsel did not fail to investigate potentially
exculpatory evidence.  Instead, he took potentially exculpatory
evidence—such as the gun found in Lindsay's glove compartment
—and ran with it.  On the record on direct appeal, we will not say
there was no strategic or tactical reason to argue for acquittal
because Solano was not the shooter.  Counsel also argued that
if the jury found he did shoot Lindsay, he either acted in self-
defense or was guilty of a lesser offense.

Because we do not find deficient performance in counsel's
closing argument, the argument was not ineffective assistance.

5. ***Sufficient evidence supported the first degree***
***murder verdict***

Solano argues the evidence failed to establish he shot
Lindsay willfully, deliberately, and with premeditation.  We
disagree.

To determine whether sufficient evidence supports Solano's
conviction, we examine the entire record in the light most
favorable to the judgment to determine whether a rational jury
could find Solano guilty beyond a reasonable doubt.  (*People v.*
*Flores* (2020) 9 Cal.5th 371, 411.)  We presume in support of the
judgment every fact the jury could reasonably deduce from the
evidence, and we accept logical inferences the jury might have
drawn from the circumstantial evidence.  (*Ibid.*)  Only the fact
finder can determine whether a witness is credible, and we
will not second-guess a jury's decision to believe a witness with
discrepancies in his or her testimony.  (*Id.* at p. 412, fn. 9.)

26

We strongly disagree that the jury's verdict was irrational on the bases Solano argues. He points out there was no evidence he knew Lindsay was going to come to his home, but premeditation and deliberation does not require an extended period of time, or protracted planning. (*People v. Bolin* (1998) 18 Cal.4th 297, 332; *People v. Millwee* (1998) 18 Cal.4th 96, 134-135.) " ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

When Lindsay arrived at the house, she and Solano had an intense conversation and she followed him inside. Shortly after, Lindsay came back outside with Solano walking behind her. He stood on the porch steps and Lindsay walked to the sidewalk by the car, telling Ortiz Solano had a gun, and arguing with Solano. Ortiz walked to the porch steps and urged Solano to keep things cool, and Solano, seeming under control, told Ortiz they would talk later. Lizette approached Solano to say goodbye, and he refused to talk. Lindsay then headed back to the house saying she wanted to kiss her children, while Lizette and Ortiz got into the car. Lizette heard a gunshot and saw Solano, in a shooting stance, pointing a gun at Lindsay and shooting her two more times as she twirled around to move away. The fatal gunshot wound was to Lindsay's back. We do not second-guess the jury's decision to believe the witnesses' testimony. Viewed in the light most favorable to the verdict, the evidence showed Solano had enough time to premeditate and deliberate when, already armed, he followed Lindsay outside, argued with

27

Lindsay, interacted with Ortiz and Lizette, and then shot Lindsay three times, killing her with a final shot to the back.

### 6. *Cumulative error does not require reversal*

Solano argues cumulative error undermined the fundamental fairness of his trial and requires reversal of his conviction. As we explain above, there was no error and therefore no cumulative error.

### 7. *We remand for the trial court to exercise discretion whether to strike the five-year enhancement*

Senate Bill No. 1393, effective January 1, 2019, amended sections 667, subdivision (a)(1), and 1385, subdivision (b), to allow the trial court to strike or dismiss a five-year serious felony enhancement. The court did not have that discretion when it imposed the five-year enhancement at sentencing. The parties agree Senate Bill No. 1393 is retroactive. (*People v. Zamora* (2019) 35 Cal.App.5th 200, 208.) We remand the case so the trial court may exercise its newly granted discretion at a hearing at which Solano is personally present with counsel. We express no opinion on how the court should rule.

### 8. *Solano should raise any challenge to the fines and fees on resentencing*

The trial court imposed a restitution fine of $300 (§ 1202.4, subd. (b)), $80 in court security fees (§ 1465.8, subd. (a)(1)), $60 in criminal conviction assessments (Gov. Code, § 70373), and a $300 restitution fine stayed unless parole is revoked (§ 1202.45). Solano argues the court should have held a hearing to determine his ability to pay, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157. The California Supreme Court is currently considering whether a court must consider a defendant's ability to pay before

imposing or executing fines, fees, and assessments.  (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)  Because we remand for further proceedings, we need not decide whether Solano is entitled to an ability to pay hearing. Solano should raise any challenge to the fees or fines on remand.

## DISPOSITION

The matter is remanded for the court to exercise its discretion whether to strike the five-year enhancement under section 667, subdivision (a)(1).  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

DHANIDINA, J.